# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1385
_____

Tawana Henderson, as Trustee for the Next-of-Kin of Mark Eric Henderson

*Plaintiff - Appellant*

v.

City of Woodbury; Officer Anthony Ofstead; Officer Natalie Martin; Officer
Stacey Krech, in their individual and official capacities

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 14, 2018
Filed: November 28, 2018

_____

Before SMITH, Chief Judge, MURPHY and COLLOTON, Circuit Judges.[*]

_____

SMITH, Chief Judge.

On August 31, 2012, Mark Henderson ("Mark") attended a party at a hotel room in Woodbury, Minnesota. The gathering turned into a hostage situation, and

_____

[*]Chief Judge Smith and Judge Colloton file this opinion pursuant to 8th Cir. Rule 47E.

Mark was shot multiple times by Woodbury Police Department Officers Stacey Krech, Natalie Bauer,[1] and Anthony Ofstead after he attempted to escape the ordeal. Mark's mother, Tawana Henderson ("Tawana"), as trustee for Mark's next-of-kin, filed a lawsuit under 42 U.S.C. § 1983 against the City of Woodbury ("City") and Officers Krech, Bauer, and Ofstead. The district court concluded that the officers were entitled to qualified immunity and granted them and the City summary judgment. Tawana now appeals. We reverse.

## I. *Background*[2]

Mark Henderson, a 19-year-old black man, was attending a party held in Room 217 of a Red Roof Inn in Woodbury, Minnesota. Without warning, one of the guests, another young black male named Demetrius Ballinger, pulled a gun. Ballinger robbed the other guests, including Mark, and held them hostage. One of the young women at the party called 911 and then hid her phone. Though the caller was unable to speak with the operator, the operator kept the line open and listened to the audible audio from the motel room through the phone.

Based on this audio, the 911 operator discerned an apparent confrontation between someone with a gun and another person with a knife. The person with the gun (Ballinger) demanded that the person with the knife (Mark) give it up. The dispatcher alerted police and reported "hear[ing] two males talking about a knife—it sounds like one possibly took it from the other and he's trying to get it back" to

---

[1]Natalie Bauer was formerly known as "Natalie Martin" and was sued under the latter name. However, in keeping with the district court, we refer to her as "Natalie Bauer."

[2]"We recite the facts in the light most favorable to [Henderson], as the nonmoving part[y]." *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 808 (8th Cir. 2008) (citation omitted).

police. *Henderson v. City of Woodbury*, 233 F. Supp. 3d 723, 726 (D. Minn. 2017) (citation omitted).

Dispatch determined that the call originated from the Red Roof Inn. But, dispatch was uncertain as to which guest room. Upon arrival, officers tried to find the room through guest records and by driving around the hotel. When this proved unsuccessful, the officers began to canvass the building by foot. Walking in the lead was Officer Krech, followed by Officers Bauer and Ryan Schroeder. Officer Krech came across Room 217, and through a gap between the window and curtain, she saw an animated black male in a dark shirt (Ballinger). Officer Krech then approached the door to see if she could hear anything. Officer Bauer took a position near the window. Ballinger then approached the window, moved the curtain to the side, and pointed his gun at Officer Bauer's head. Officer Bauer yelled "Gun!," and the officers retreated. *Id.* (citation omitted). By this point, Officers Bauer and Krech had drawn their guns.

The officers called for backup and secured the area. They were positioned at a breezeway area at the top of the stairs to the second floor. Officer Ofstead and Sergeant Christopher Murray were the first arriving backup officers. Together, the officers discussed the situation and decided to call a SWAT team.

Suddenly, finding an opportunity to escape, Mark opened the door to Room 217 and ran down the hallway. Ballinger, the hostage taker, fired a shot at Mark. The officers heard this gunshot, but they did not see who fired it or where it landed.[3] Mark continued running down the hallway toward the breezeway, in the direction of the officers. He was not armed. According to the officers, they ordered Mark to stop, relinquish the weapon they believed he possessed, and get on the ground. As Mark

---

[3]The medical evidence indicates that it went through Mark's left hip and traveled through his body before becoming lodged in his right arm.

neared them, Officers Ofstead and Krech, who at this point were positioned closest to Mark, fired at him but missed.

After hearing the shots, Mark stopped and got facedown in the hallway. Then, according to the officers, Mark "pushed himself up with his left hand, and his right hand was obscured beneath his torso." *Id.* at 727. The officers contend that Mark raised up as they ordered him multiple times to show his hands and stay down. They also allege that he lifted his torso and moved his right arm, which had been obscured. Interpreting this as threatening, Officers Krech, Bauer, and Ofstead fired a combined 17 rounds, 12 of which struck Mark. He died shortly thereafter.

Tawana brought this § 1983 action against the City and Officers Krech, Bauer, and Ofstead. The officers were sued in both their individual and official capacities. The suit alleged that the officers violated Mark's right under the Fourth Amendment to be free of excessive force in the course of an arrest and were liable for wrongful death under Minn. Stat. § 573.02. It also alleged vicarious liability against the City under Minnesota state law.

Following discovery, the defendants moved for summary judgment. They argued that the totality of the circumstances, especially Mark's perceived non-compliance, created a reasonable belief that Mark posed a serious threat, rendering their use of deadly force objectively reasonable and entitling them to qualified immunity. Tawana argued in opposition that there were multiple genuine issues of material fact that, if resolved in her favor, supported a finding that the officers acted unreasonably.

Tawana contended that the officers should have known that they were dealing with a hostage situation, that the difference between Mark's and Ballinger's shirt colors should have made clear that Mark was not the hostage taker, and that the officers shot Mark without giving him enough time to comply with their potentially

-4-

conflicting orders. Crucially, Tawana also asserted that a statement that Officer Krech made to the Minnesota Bureau of Crime Apprehension (BCA) shortly after the incident suggested that the officers had shot Mark despite his compliance.

The BCA had conducted interviews with the officers on the scene the day of the shooting. Officer Krech stated the following regarding the second, lethal set of shots:

[Senior Special Agent Drew Evans] DE[:]Okay, when [Mark] goes down to the ground what happened uh, he, you said he kind a went down to a prone position or he kind a fell down kind a near where you were.

[Officer Krech] SK[:] Um-hm.

DE[:] What happened there?

SK[:] He, he stopped.

DE[:] Okay.

SK[:] Told 'em to put his hands out, "Keep your hands out, keep your hands out, keep your hands out," which he did and um then he didn't move we told him not to move and he didn't and we kind of we had our guns drawn on him now and then I think somebody else was, had some cover until we had him, our weapons were directed at him until we had sufficient equipment there to pull him to safety.

. . .

DE[:] Okay, when he went down, were any additional shots fired after that?

SK[:] I don't think after he went down um.

DE[:] Did you fire any additional shots after that?

SK[:] I don't think so.

Decl. of J. Ashwin Madia in Opp'n to Def's Mot. for Summ. J., Ex. 60, at 6, *Henderson v. City of Woodbury*, No. 0:15-cv-03332-RHK-FLN (D. Minn. Dec. 1, 2016), ECF No. 86-36.

The district court disregarded this statement and instead relied primarily on the later statements Officers Krech, Bauer, and Ofstead made in their depositions. In their depositions, the officers uniformly averred that Mark's failure to comply with their commands was the cause of the shooting. The court broke the encounter down into two discrete incidents: (1) the round of shots fired when Mark came running down the hallway, and (2) the fatal shots fired while he was on the ground. After applying separate excessive force analyses to each, the district court ruled that the defendants were entitled to qualified immunity.

Regarding the first shooting, the court stated that the limited information the officers had made it "reasonable for the officers to perceive Mark as a serious threat." *Henderson*, 233 F. Supp. 3d at 729.

Though the district court expressed more difficulty in determining the propriety of the second round of shots, it ultimately concluded that it was reasonable, as well. The court explained:

> To be sure, the officers' second use of force presents a closer call. The circumstances indicate that, when the officers opened fire a second time, Mark posed less of a threat—he had been fired upon, he appeared to comply with officers' commands to get on the ground, and he faced an additional, armed officer (Bauer). There is no indication, however, that the officers had reason to believe their first volley of gunfire had hit

-6-

Mark. There is no evidence he showed signs of injury or called out as having been struck. In addition, the officers testified that he did not *fall* to the ground but went down *deliberately*, indicating he retained control of his body and movements. The officers ordered him to "show me your hands," "put your arms straight up," and "stop or I'm going to shoot." *It is undisputed that he failed to comply with these commands.* Instead, he pushed his chest off of the floor with his left hand and appeared to try to roll onto his right side with his right hand obscured beneath his torso. Krech testified that she could not see his right hand, and she was worried it held a gun. Bauer "remember[ed] thinking he made it this far, he's going to kill us." After Mark failed to comply, Krech, Ofste[ad], and Bauer fired additional rounds until his right hand became visible.

In the Court's view, this second use of force was reasonable. As discussed above, the officers reasonably believed that Mark posed a threat when he exited Room 217. He then failed to comply with additional commands and moved to the intersection of the balcony and the breezeway, where he was closer to the officers and had eliminated the cover the officers previously enjoyed around the corner from Room 217. The officers' testimony that they could not see Mark's right hand beneath his torso stands unrebutted and, as such, the Court perceives no intervening facts from which the officers should have concluded the threat had subsided.

*Id.* at 731–32 (third emphasis added) (citations and footnote omitted).

Finding the use of force reasonable, the court granted summary judgment on the federal excessive force claim. The court then relied on this conclusion to support a finding that the defendants were entitled to official immunity on the state-law claims. Following the entry of judgment, Tawana timely appeals.

## II. *Discussion*

"We review the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all

reasonable inferences in that party's favor." *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011) (citation omitted). A movant is entitled to "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (citing *Chambers*, 641 F.3d at 904).

"Qualified immunity shields government officials from liability and the burdens of litigation in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *LaCross v. City of Duluth*, 713 F.3d 1155, 1157 (8th Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). Qualified immunity is inappropriate if "the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and . . . that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 1158 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

"Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Nance v. Sammis*, 586 F.3d 604, 610 (8th Cir. 2009) (citation omitted). In determining whether qualified immunity is appropriate in an excessive force case, the

> question . . . is whether a genuine question of material fact exists regarding whether [the officers'] actions—as defined by the plaintiff's version of the events—were objectively reasonable. Our review is de novo. A shooting is objectively reasonable when the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical harm to the officer or others. But the calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. And we must remember not to indulge in armchair quarterbacking or exploit the benefits of hindsight when evaluating police officers' use of deadly force.

*Ribbey v. Cox*, 222 F.3d 1040, 1043 (8th Cir. 2000) (cleaned up).

At oral argument, counsel for the appellant framed this case as presenting more of a "fundamental [Federal] Rule of [Civil Procedure] 56" issue than of "official immunity or qualified immunity." We agree.

By concluding that "[i]t is undisputed that [Mark] failed to comply with [the officers'] commands," *Henderson*, 233 F. Supp. 3d at 731, the district court gave no weight to Officer Krech's BCA statement and reached a conclusion that leaves a crucial material fact unresolved. This question is whether Mark complied with the officers' commands before they shot him.

The officers' deposition testimony and much of their BCA testimony states that Mark had not fully complied with their commands. They assert that while he was on the ground, his hands were not visible to them. They believe that their obscured vision of one his Mark's hands supported an objectively reasonable belief that he posed a significant threat of death or serious bodily harm. However, considered in the light most favorable to the plaintiff, Officer Krech's BCA statement supports a contrary finding: that Mark fully and unequivocally surrendered to police, lay still, and was shot and killed anyway. If true, such action would have violated Mark's clearly established constitutional rights. *See Nance*, 586 F.3d at 611 ("Existing case law would have made it sufficiently clear to a reasonable officer that a suspect cannot be apprehended by use of deadly force unless that individual poses a threat of serious physical harm."). The resolution of the conflicting testimony between one officer's

more or less contemporaneous description and all the officers' subsequent unified deposition testimony is best left to a jury. Therefore, the district court erred in granting qualified immunity.

We have stated that "[d]isputed factual issues and conflicting testimony should not be resolved by the district court" at the summary judgment stage." *Wealot v. Brooks*, 865 F.3d 1119, 1128 (8th Cir. 2017) (citing *Coker v. Ark. State Police*, 734 F.3d 838, 843 (8th Cir. 2013) ("Making credibility determinations or weighing evidence in this manner is improper at the summary judgment stage, and it is not our function to remove the credibility assessment from the jury.")) (other citation omitted). What Officer Krech meant in her BCA statement and the weight it should be given are matters for a jury to decide. That fact, once determined, will be material to determining whether the officers' use of deadly force was reasonable. Therefore, we reverse the district court's grant of summary judgment on the § 1983 claim.

The district court's grant of official immunity for the state-law claims rested on the court's conclusion that the officers were entitled to qualified immunity. Because we reverse on that point, we also reverse the grant of summary judgment on Tawana's claims for wrongful death and vicarious liability under Minnesota law. *See Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005).[4]

---

[4]Minnesota law provides that

the decision to use deadly force is a discretionary decision entitling a police officer to official immunity absent a willful or malicious wrong. Official immunity also protects government entities from vicarious liability for actions that are entitled to immunity. In determining whether an official committed a willful or malicious wrong, the court considers whether the official has intentionally committed an act that he had reason to believe is prohibited. Whether or not an officer acted willfully or maliciously is usually a question of fact to be resolved by the jury. The reasoning that led us to affirm the denial of qualified immunity as

### III. *Conclusion*[5]

We reverse and remand for further proceedings consistent with this opinion.

_____

to plaintiffs' Section 1983 claims leads us to affirm the denial of official immunity as to the state-law claims.

*Craighead,* 399 F.3d at 963 (citations omitted).

[5]Tawana filed a motion to supplement the record with an affidavit of one of the hostages. We deny it as moot.

-11-