# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-1109
_____

Luke LeFever

*Plaintiff - Appellant*

v.

Dawson County Sheriff's Department

*Defendant*

Ivan Castellanos, Dawson County Deputy, in his official and individual capacities;
Jerome Kramer, Lincoln County Sheriff, in his official and individual capacities;
Deputy Roland Kramer, Chief Deputy, in his official and individual capacities;
Brett Schmidt, Deputy, in his official and individual capacities; Elwood, Nebraska
State Patrol Trooper Sgt., in his individual capacity; County of Dawson, Nebraska;
Lincoln County; Carlos Trevino, Nebraska State Patrol Trooper, in his individual
capacity

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Nebraska - Lincoln
_____

Submitted: December 14, 2023
Filed: July 31, 2024
_____

Before ERICKSON, MELLOY, and STRAS, Circuit Judges.
_____

MELLOY, Circuit Judge.

Plaintiff Luke LeFever lunged at an officer during a roadside encounter. Two tasings failed to subdue Mr. LeFever, and he fled. He attempted to steal a police cruiser, attempted to steal a truck, broke into a nearby home, assaulted a resident, and stole a utility vehicle. The officer shot at the vehicle's rear wheel from close range but failed to stop it. The officer then radioed a dispatcher and stated, "shots fired," as he attempted to follow Mr. LeFever.

During an ensuing chase, Mr. LeFever stole a pick-up truck and recklessly evaded officers from multiple jurisdictions for two hours, driving at speeds approaching 100 miles per hour, driving off-road, and driving the wrong direction on Interstate 80. An officer eventually rammed the truck as Mr. LeFever attempted to exit a field onto a gravel road. The truck then reversed toward other officers, and officers began shooting at the truck. The truck began to drive forward, and officers continued shooting. In total, officers fired 60 to 70 rounds toward the truck, with some shots fired as the truck eventually stopped moving. Mr. LeFever was hit and suffered permanent serious injuries.

Mr. LeFever filed the present civil action *pro se* from within Nebraska's state penitentiary. He alleged unreasonable seizure and excessive force claims against the initial officer and the other officers. He also alleged the initial officer shared liability for the later shootings for reporting "shots fired" but failing to clarify that Mr. LeFever had not fired any shots.

The district court[1] denied requests from Mr. LeFever for the discretionary appointment of counsel to assist him with this civil case and granted summary judgment to all defendants. We find no abuse of discretion in the denial of counsel. We also agree summary judgment was appropriate on all claims.

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

## I.

Deputy Castellanos of the Dawson County, Nebraska, sheriff's department responded to a report regarding a potentially abandoned car on a gravel road.[2] When he arrived at the car, Mr. LeFever was sitting in the driver's seat, and there were two tires on the ground on the driver's side near the rear of the vehicle. Deputy Castellanos approached the front passenger window and saw a bag from a Colorado marijuana shop sitting on the seat. Deputy Castellanos was familiar with such bags from Colorado, where marijuana is generally legal under state law. He began speaking with Mr. LeFever, who exited the vehicle and stood by the driver's door. It was immediately apparent that Mr. LeFever is a much larger and younger man than Deputy Castellanos.

Mr. LeFever described car trouble and admitted his driver's license was suspended. He claimed to be driving to a location in Nebraska from Colorado, but this explanation made no sense to Deputy Castellanos given the location of the car and the gravel road. During the initial discussion between the two men, Deputy Castellanos repeatedly stated Mr. LeFever was "not in any trouble" and the deputy would try to help get him on his way. Deputy Castellanos told Mr. LeFever he was not going to arrest him for driving without a license as there would be "no point." During this discussion, another police cruiser drove through the scene, and Mr. LeFever said, "Jesus Christ, you got back up, hmm."

---

[2]The facts as described herein are drawn primarily from audio and video recordings captured by multiple law enforcement officers' dashcam or bodycam recordings. The recordings in this case were obtained in broad daylight and are remarkably clear. Facts are also drawn from affidavits submitted by defendant members of the Lincoln County Nebraska Sheriff's Department. Mr. LeFever does not dispute the referenced facts as asserted in these sources other than putting forth select counter-assertions that conflict with the clear videos. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Mr. LeFever admitted he was carrying no identification, so Deputy Castellanos had Mr. LeFever write down identifying information. Deputy Castellanos then returned to his cruiser to report the information and check for warrants. While Deputy Castellanos was in his cruiser, Mr. LeFever appeared to be working on his car in the area of the rear driver's side wheel. Mr. LeFever then stood and leaned into the driver's door to reach across the car. He then exited the car, locked the door, and returned to the rear of the car. Meanwhile, dispatch told the deputy that Mr. LeFever's history included a drug offense and a weapon-related felony.

Deputy Castellanos eventually exited his cruiser and asked Mr. LeFever if he had anyone who could come for the car, stating that, although he was not going to arrest Mr. LeFever for driving without a license, he could not permit him to drive away. Deputy Castellanos gave Mr. LeFever a phone to call a driver then walked around the car looking in the windows as Mr. LeFever used the phone. Deputy Castellanos noticed the car had been locked and the bag had been moved from the front seat.

Deputy Castellanos asked Mr. LeFever about the bag he appeared to be hiding, and Mr. LeFever stated he had grabbed it to hold lug nuts. Deputy Castellanos eventually asked for permission to search the car. Mr. LeFever repeatedly denied permission. Believing he had probable cause, Deputy Castellanos stated he would search the car anyway. Mr. LeFever became angry and refused to unlock the car. Mr. LeFever then permitted Deputy Castellanos to pat him down. At this time, Officer McCandless from the Gothenburg Police Department appeared in front of Deputy Castellanos's vehicle and near the two men.

Eventually, Deputy Castellanos asked Mr. LeFever to put his arms behind his back. Mr. LeFever became loud and agitated and began to walk away. Deputy Castellanos unholstered his taser and the two men yelled at each other. The deputy repeatedly warned Mr. LeFever that he would use the taser. Mr. LeFever eventually dropped to his knees as requested by Deputy Castellanos and put his hands behind

his head. Deputy Castellanos told Mr. LeFever that he was under arrest. In response, Mr. LeFever rose to one knee and became more agitated. He resisted Officer McCandless's attempts to put him in handcuffs and lunged at Deputy Castellano, reaching for the taser.

Deputy Castellanos then tased Mr. LeFever who writhed on the ground before dislodging the taser prongs. Mr. LeFever swung his arm toward Deputy Castellanos who responded by tasing him a second time. Again, Mr. LeFever was able to dislodge the prongs. He then ran to Deputy Castellanos's car, failed in an effort to open the car, and ran off toward a nearby farmhouse.

Deputy Castellanos pursued, and when he reached the house, an occupied SUV with its lights on was sitting at the bottom of a long driveway. Mr. LeFever was at the top of the driveway reaching into a parked pick-up truck through the driver's door. Deputy Castellanos saw a man exit the house before Mr. LeFever ran past the man and into the house. Mr. LeFever then exited the house, assaulted the man, and stole a utility vehicle, speeding off.

While driving to the house, while in the driveway, and afterwards, Deputy Castellanos's labored breathing and strained physical state were clear. As Mr. LeFever drove away from the house, down the driveway, and toward the occupied SUV, he passed near Deputy Castellanos who had exited his vehicle and drawn his sidearm. At essentially point-blank range, Deputy Castellanos shot downward at the rear passenger-side wheel of the utility vehicle, dislodging what appears to be a small hubcap, but otherwise failing to hinder Mr. LeFever's escape.

Deputy Castellanos then entered his vehicle, called a dispatcher, reported the escape, and stated, "shots fired." He was able to follow Mr. LeFever to another farmhouse where he discovered the stolen utility vehicle and saw Mr. LeFever driving off in a stolen pickup truck. Approximately 13 minutes later, in response to a dispatcher's question as to whether Mr. LeFever was armed, Deputy Castellanos stated that he had not found any weapons on Mr. LeFever when he patted him down.

Eventually, Deputy Castellanos stopped his chase and other officers continued the pursuit.

The pursuit of Mr. LeFever in the stolen truck lasted approximately two hours. During that time, he drove at speeds approaching 100 miles per hour and travelled on gravel roads, dirt roads, highways, and farm fields. He drove through fences, drove the wrong direction on Interstate 80, became airborne, and avoided spiked stopping strips. Eventually officers were able to park on gravel roads on two sides of a fenced field where Mr. LeFever was located.

Nebraska State Trooper Trevino was near the corner of the two gravel roads. He received a report that Mr. LeFever was approaching the corner through the field. As Mr. LeFever broke through a fence and began to enter one of the gravel roads, Trooper Trevino accelerated into the passenger side of the truck, ramming it and momentarily stopping it. Mr. LeFever, however, immediately backed into the field, turning the rear of his truck toward police officers standing near a police vehicle parked on the adjacent, intersecting county road. Seeing this, Trooper Trevino exited his vehicle and fired at Mr. LeFever's stolen truck with his sidearm. The other officers also began shooting. Mr. LeFever then put his truck in drive and began driving across the field, away from the gravel road intersection, and toward farm buildings. The officers continued shooting. Trooper Trevino can be heard reporting "shots fired" and "vehicle still moving" while he was shooting. Eventually the truck rolled to a stop, disabled and smoking, and Trooper Trevino can be heard saying the vehicle had stopped as a few final shots are heard.

The other officers shooting toward the truck included defendants Lincoln County Sheriff Jerome Kramer, Chief Deputy Roland Kramer, and Deputy Brett Schmidt. These officers shot at Mr. LeFever's truck as he backed toward them after the collision and continued shooting as he drove away and as the truck stopped. The officers assert in affidavits that they believed Mr. LeFever was going to back into them. They also assert they believed they were in a firefight as they had received the earlier report of "shots fired" and saw Mr. LeFever's windows breaking. Finally,

Deputy Schmidt admits that he shot into Mr. LeFever's cab after the truck eventually stopped moving. Deputy Schmidt asserts that he shot into the cab because he saw Mr. LeFever reaching over as if to grab a weapon. After a few seconds passed without further shots or movement, officers approached the truck cautiously, providing cover for one another. Mr. LeFever was unarmed. He asserts that the officers, collectively, shot 60 to 70 rounds at his truck. He was hit several times and suffered serious and permanent injuries.

Mr. LeFever filed suit *pro se*, bringing 42 U.S.C. § 1983 claims: (1) individual capacity claims against Deputy Castellanos alleging an unreasonable arrest and excessive force based on the tasings and the shot fired down at the utility vehicle's wheel; (2) an individual capacity claim against Deputy Castellanos alleging joint liability for the other officers' subsequent shootings in the field based on his earlier report of "shots fired"; (3) individual capacity excessive force claims against Trooper Trevino based on the vehicle collision and the subsequent shootings; (4) individual and official capacity excessive force and unreasonable arrest claims against Sheriff Kramer, Chief Deputy Kramer, and Deputy Schmidt for the shots fired in the field.

Mr. LeFever repeatedly asked the district court to appoint counsel to help him with his civil action: in his complaint, in an amended complaint, in a motion for counsel, in repeated motions for reconsideration, and finally, in response to the defendants' motions for summary judgment. The district court denied the first motion, in which Mr. LeFever asserted he had unsuccessfully sought assistance from seven different attorneys. The district court stated that although "these consolidated cases involve five defendants, the claims involved are not all that complicated." The court further stated that Mr. LeFever had demonstrated the ability to plead his case and file appropriate motions. The court noted that Mr. LeFever specifically sought counsel's help with additional discovery, but the time for written discovery had passed and, even if counsel were appointed, Mr. LeFever would bear the costs associated with depositions. Finally, the court addressed specific concerns Mr. LeFever asserted regarding limited access to the prison library and the inability to

view electronically stored information. The court noted that extensions of time had been granted in the past and would be granted again upon proper motion. The court also stated that "[i]f [Mr. LeFever] has obtained some particular material through discovery that he has not been allowed to view, he should request the court's assistance to arrange a viewing."

The district court rejected Mr. LeFever's first motion to reconsider, treating it as a Rule 60(b) motion directed to a non-final order and finding no basis for reconsideration. The court denied a subsequent motion in which Mr. LeFever renewed his request, stated that he sought to depose 25 witnesses, and complained that the prison had confiscated DVDs produced to him during discovery. In denying the motion, the court repeated its earlier explanation that the appointment of counsel would not relieve Mr. LeFever of the cost of paying for depositions.

After granting Mr. LeFever extensions resulting in six months to resist motions for summary judgment, the district court granted the defendants' motions for summary judgment and again denied appointment of counsel. The district court found no constitutional violation in Deputy Castellanos's tasing and attempted arrest of Mr. LeFever: Deputy Castellanos had probable cause, use of the taser was objectively reasonable, and there was no excessive force in shooting at the utility vehicle's tire. Regarding the report of "shots fired," the district court found any lack of clarity was, at worst, mere negligence. The district court also granted summary judgment to all remaining defendants, finding Trooper Trevino's ramming of the stolen pickup truck reasonable under the circumstances and finding all officers' shots fired toward the truck in the field reasonable in light of the risks posed by Mr. LeFever. In the alternative, the district court stated that, even if there had been a constitutional violation, qualified immunity would apply due to the absence of clearly established authority demonstrating the breach of a constitutional right. Finally, the court also granted summary judgment on the official capacity claims. We appointed counsel to assist Mr. LeFever on appeal.

## II.

We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party. *See Henderson v. City of Woodbury*, 909 F.3d 933, 938 (8th Cir. 2018). This standard, however, does not require that we disregard clear physical evidence unequivocally disproving a nonmoving party's statements. *See Scott*, 550 U.S. at 380.

Here, all officers moved for summary judgment asserting qualified immunity. Qualified immunity exists to give officers breathing room to take fast action in rapidly evolving and dangerous situations without fear of later facing individual liability. As such, qualified immunity prevents liability for actions occurring in gray areas: it applies unless the case presents facts demonstrating (1) "the deprivation of a constitutional or statutory right" that was (2) "clearly established at the time of the deprivation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted). We may address these two requirements in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To be "clearly established," a right must be defined with specificity, and "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not necessary for there to be a perfectly analogous prior case for a right to be "clearly established." *Id.* But "in the light of pre-existing law the unlawfulness must be apparent." *Id.* Accordingly, details matter, and we do not conduct our qualified immunity analysis in reference to abstract rights at a high level of generality. *Id.* at 639–40; *see also District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (emphasizing that we "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced'" (citation omitted)). Ultimately, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

We address the claims against Deputy Castellanos first. On appeal, Mr. LeFever no longer challenges the deputy's actions in relation to the shot fired at the utility vehicle's wheel. Rather, he argues Deputy Castellanos used excessive force in tasing him during the initial encounter. Mr. LeFever also characterizes Deputy Castellanos's failure to more clearly describe the call of "shots fired" as rising to the level of a substantive due process violation under the Fourteenth Amendment.[3]

The initial tasing involved no constitutional violation. As an initial matter, Deputy Castellanos had more than adequate probable cause to detain Mr. LeFever for driving without a license (as admitted by Mr. LeFever) and for suspected drug possession or trafficking. *See Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010) (stating that probable cause is present where the totality of the "circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense" (citation omitted)); *see also Ornelas v. United States*, 517 U.S. 690, 695 (1996) ("Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" (citations omitted)). The entire scene at the side of the road was strange and strongly suggested drug activity. Mr. LeFever made statements as to his time of arrival not matching the initial call that had caused the deputy to investigate. He appeared to be lying regarding his destination. He attempted to hide the marijuana bag, which the deputy recognized from experience and which matched Mr. LeFever's claim to be coming from Colorado. Finally, Mr. LeFever's act of surreptitiously locking the previously unlocked door when the deputy was in his

---

[3]Regarding the report of "shots fired," the district court noted the wholesale absence of authority to support a derivative excessive force claim based on later, allegedly excessive force by different officers who heard the report. Accordingly, the district court analyzed Mr. LeFever's "shots fired" claim against Deputy Castellanos as a "false arrest" claim. On appeal, Mr. LeFever frames his claims as a Fourteenth Amendment substantive due process claim.

cruiser cast an additional pall of suspicion on all the other acts. *See, e.g.*, *Wesby*, 583 U.S. at 61 (explaining that the totality of the circumstances test requires elements of suspicion to be viewed collectively rather than individually and that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts").

With probable cause comes the ability to exercise at least that amount of force necessary and reasonable in the circumstances to restrain a suspect. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Here, after much arguing, Mr. LeFever only partially complied with the deputy's instruction to put his hands behind his back and to get on his knees. Mr. LeFever then actively resisted Officer McCandless's attempt to place him in handcuffs. Deputy Castellanos repeatedly warned Mr. LeFever that he would use the taser. Finally, before the first tasing, Mr. LeFever lunged at Deputy Castellanos, and before the second, he swung his arm at the deputy. In context, the two tasings, preceded by numerous warnings, were reasonable. They were not excessive responses to Mr. LeFever's aggression. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) ("To determine whether a particular use of force was excessive, the court considers whether it was objectively reasonable under the circumstances, relying on the perspective of a reasonable officer present at the scene rather than the 20/20 vision of hindsight. Force is excessive when an officer's actions are not objectively reasonable in light of the facts and circumstances confronting him." (cleaned up)). Mr. LeFever's arguments to the contrary depend largely on characterizations of the scene that flatly contradict the clear video.

To the extent Mr. LeFever attempts to characterize the deputy's initial denial of an intent to arrest or cite him as somehow bolstering his unreasonable force claim, we reject his argument. Officers often must dissemble to buy time or maintain safety, especially in isolated locations or in potentially fraught situations involving large suspects with felony records. Any agitation or irritation caused by the deputy's

inconsistent assertions did not justify Mr. LeFever in lunging at the deputy. Nor did it deprive the deputy of the ability to use force to protect himself and effect an arrest.

Regarding the report of "shots fired," we agree with the district court that no reasonable jury could find that infirmities in the report amounted to anything more than mere negligence. Deputy Castellanos called in the report of "shots fired" almost immediately after he fired at the utility vehicle's wheel. He was out of breath, obviously fueled by adrenaline, and in a heightened state of emotion caused by the stressful situation. Shortly after the report, he answered a dispatcher's question as to Mr. LeFever's status by stating correctly that he had not found a weapon on Mr. LeFever when he patted him down. Deputy Castellanos could have reported more detailed information, but he did not report false information. Mere negligence will not support the due process claim Mr. LeFever articulates on appeal. *See Daniels v. Williams*, 474 U.S. 327, 331–33 (1986) (noting that the due process clause was intended to protect people from intentional and oppressive government actions, not mere negligence); *Griffin v. Hilke*, 804 F.2d 1052, 1055 (8th Cir. 1986) (dispatcher's broadcast of false information was at most negligence and did not support a substantive due process claim).

Turning to the other defendants, we agree with the district court that the use of force was reasonable in context. In general, deadly force against a fleeing suspect is an unreasonable seizure unless such force is required to stop an escape and there is probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Here, the requisite significant threat of serious injury was present. Although Mr. LeFever argues that, at different moments, he was merely fleeing without presenting significant risk or that he had abandoned his flight, we easily conclude the videos disprove his assertions.

As an initial matter, Trooper Trevino's use of his vehicle to ram Mr. LeFever's truck was reasonable and necessary in light of the reckless ongoing flight. Arguments to the contrary are frivolous.

-12-

As to the firing of shots, we find no excessive force in the initial firing of shots at Mr. LeFever's truck when he backed toward the officers standing near their vehicles or as he began driving away and across the field. Preceding the shots, as already repeatedly stated, Mr. LeFever acted with extreme recklessness and disregard for officers' and civilians' safety. He destroyed property, stole multiple vehicles, assaulted a man, lunged at an officer, and drove the wrong way on an interstate. It was entirely appropriate to stop his ongoing danger to officers and the public, and it was reasonable to use firearms, especially after he drove in reverse toward officers who were outside their cars.

Mr. LeFever points to the fact that the officers standing outside their vehicles were on the other side of a fence while he backed his vehicle toward them. We conclude the presence of the fence carries little weight in the present context. Mr. LeFever had just broken through a similar fence before being hit by Trooper Trevino's vehicle and had broken through several other fences during the chase. No reasonable jury could view the pasture fence as an impediment to Mr. LeFever or a source of protection for the officers.

Mr. LeFever also argues that the total number of shots fired, 60 to 70, was excessive and, in the apparent alternative, that the firing of shots cannot be viewed collectively but must be divided into subunits, with shots fired after he resumed driving forward and after he came to a stop receiving separate analysis from the shots fired as he backed toward the officers. In support of his argument, he cites a case involving the use of a taser in which our court held a second tasing had to be analyzed separately from an initial tasing. *See Jackson v. Stair*, 944 F.3d 704, 711–12 (8th Cir. 2019).

*Jackson* is unavailing as applied to the present claims. *Jackson* stands for the unremarkable proposition that, in certain factual scenarios, intervening time or circumstances may make it appropriate to analyze applications of force separately. *Jackson* sets forth no bright line rule of general applicability requiring courts after

the fact—or officers during a rapidly unfolding scene—to draw artificial distinctions.

Even if we were inclined to accept the subdivided mode of analysis identified by Mr. LeFever, we would conclude no jury could view the force used in the present case as unreasonable in light of the extreme risk posed by Mr. LeFever. Reasonable officers could believe, on the undisputed facts, that they were in a firefight. The dust from the gravel-road collision, permissible shots from several directions, breaking glass, and Mr. LeFever's obvious disinclination to terminate his reckless flight make it impossible to find a demarcation separating permissible from impermissible shots. No one officer fired the entirety of the 60 to 70 shots, and the shots occurred very quickly. Even after the vehicle stopped, officers clearly were providing cover for one another and approaching the vehicle cautiously, demonstrating anticipated fire. Officers on the scene could reasonably view the danger as ongoing even when the vehicle stopped.

In the alternative, no clearly established precedent demonstrates that any individual officer would have known that firing 10 to 15 shots at the truck—even with some shots fired after the vehicle stopped—violated Mr. LeFever's rights.[4] Mr. LeFever attempts to distinguish his case from precedent involving shots fired at a fleeing vehicle where the Supreme Court found no constitutional violation. *See Plumhoff v. Rickard*, 572 U.S. 765 (2014). In *Plumhoff*, the Court found no excessive force when officers shot 15 times within 10 seconds at a vehicle. *Id.* at 768–70. There, the driver led police on a high-speed chase after fleeing from a traffic stop for a broken headlight. *Id.* at 769. The chase in *Plumhoff* was not as long or seemingly as dangerous as in the present case, but the suspect did bump into a police car. *Id.* The chase had not started with a violent encounter with police, but shortly before shots were fired, the suspect drove his car close enough to an officer for the

---

[4]Taking the facts in the light most favorable to Mr. LeFever, he asserts officers fired 10 to 15 shots each.

officer to touch the suspect's car. *Id.* at 769–70. The present case involved more shots than in *Plumhoff*.

Qualified immunity, however, does not rest on the fine distinctions of jurists comparing situations in hindsight. Mr. LeFever identifies no cases demonstrating a clear violation of his rights on similar facts, and his attempts to distinguish *Plumhoff* do not suffice. *See Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 835 (8th Cir. 2021) ("The [plaintiffs] have the burden to show that their right was clearly established at the time of the alleged violation."). Accordingly, qualified immunity protections were appropriate for the defendants who shot at him in the field. *See Blazek v. Iowa City*, 761 F.3d 920, 924 (8th Cir. 2014) ("[W]here the use of force . . . likely resides on the 'hazy border between excessive and acceptable force,' we cannot conclude that only a 'plainly incompetent' officer would have believed the force . . . was constitutionally reasonable." (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001))).

For the same reasons, the district court properly dismissed the official capacity claims. *See McKay v. City of St. Louis*, 960 F.3d 1094, 1102–03 (8th Cir. 2020) ("As summary judgment was proper on [individual capacity] claims against the Police Defendants because they did not violate his constitutional rights, his *Monell* claim against the City and Board Defendants in their official capacities also fails.").

Finally, we review for abuse of discretion the denial of counsel for an indigent civil plaintiff. *See* 28 U.S.C. § 1915(e)(1) ("The court *may* request an attorney to represent any person unable to afford counsel." (emphasis added)); *Crozier for A.C. v. Westside Comty. Sch. Dist.*, 973 F.3d 882, 890 (8th Cir. 2020) (standard of review). There is no statutory or constitutional right to appointed counsel in such cases. *See Rayes v. Johnson*, 969 F.2d 700, 702 (8th Cir. 1992). Still, a district court's broad discretion pursuant to § 1915(e)(1) is "not unbounded." *See Crozier*, 973 F.3d at 890, 891–92 (reversing a denial of counsel where first amendment issues were complicated and the benefit of counsel would assist "the plaintiffs and the court").

-15-

We have held that district courts should consider several nonexclusive factors when considering the appointment of civil counsel, and that factors may be entitled to different weight in different cases: (1) whether the plaintiff and the court will benefit from the assistance of counsel; (2) whether the case is factually complex; (3) whether the plaintiff is able to investigate the facts, (4) whether there exists conflicting testimony, (5) whether the plaintiff is able to present his claim; and (6) whether the case involves complex legal issues. *See In re Lane*, 801 F.2d 1040, 1043–44 (8th Cir. 1986) (collecting factors and rejecting any *per se* rules to limit district courts' discretion).

Here, the district court considered the appropriate factors, considered no improper factors, and committed no abuse of discretion. We agree that the facts and legal principles at issue are clear and uncomplicated. The ample incontrovertible evidence available in this case (including extensive video evidence) minimized the need for additional factual investigation. The frequently litigated issues of excessive force and probable cause left the court itself in little need of assistance. And they are issues easily understood by laypersons. Finally, in managing the case with a *pro se* plaintiff, the district court granted generous extensions and offered assistance where Mr. LeFever described difficulties with litigating his case from prison.

We affirm the judgment of the district court.

_____