

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0222-22

---

### JEREMIAH NAVARRO, Appellant

### v.

### THE STATE OF TEXAS

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST COURT OF APPEALS
### COMAL COUNTY

---

PARKER, J., delivered the opinion of the Court except as to part II.C.1 in which SCHENCK, P.J., and YEARY, KEEL, and FINLEY, JJ., joined and filed an opinion as to part II.C.1 in which KEEL and FINLEY, JJ., joined. YEARY J., filed a concurring opinion in which SCHENCK, P.J., joined. WALKER, J., filed a dissenting opinion in which NEWELL and MCCLURE, JJ., joined. RICHARDSON, J., concurred.

In this case, a defendant illegally resisted an arrest, and during that resistance, circumstances escalated to the point where the defendant felt his life was in danger. Can such a defendant use the necessity defense to justify an assault on the arresting officer to remove the danger to his life? The answer to that question is "no." In arriving at that answer, we overrule *Bowen v. State.*[1] We conclude that, if a defendant would not be justified in using force to resist arrest under the self-

---

[1] 162 S.W.3d 226 (Tex. Crim. App. 2005).

defense statute to protect himself from the officer's use of force, he would also not be justified in using such force under the necessity statute. Consequently, we affirm the judgment of the court of appeals, though we do so for different reasons than articulated by that court.

## I. BACKGROUND

### A. Facts

We set out the facts in the light most favorable to Appellant.[2] Some of these are drawn from his testimony, and others are based on photos or electronic recordings and are thus not disputed or cannot reasonably be questioned.[3] A video recording from Officer Lucien Braan's patrol car was admitted into evidence. Nothing that occurred in the encounter can be seen on the video, but audio of what was happening can be heard. Some parts of the audio are clear, some are difficult, and some are unintelligible, but we include some of the audio that is clear in our recitation of the facts.

On April 25, 2014, three 911 hang-up calls were received from an upholstery business, and officers were dispatched to the location.[4] When Officer Brian Turner arrived, he found Appellant's

---

[2] *See infra* at n.22. As a consequence, we do not consider police testimony that Appellant engaged in a number of dangerous acts: that Appellant rubbed a towel into the transmission fluid, lit it on fire, and waved it at the officers; that Appellant hit Officer Turner on the head with a trophy and tried to stab him with a screwdriver; and that Appellant tried to use his lighter to set fire to the transmission fluid on the floor. In his testimony, Appellant denied engaging in these acts.

[3] *See Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (When a "videotape presents indisputable visual evidence contradicting essential portions" of an officer's testimony, "we cannot blind ourselves to the videotape evidence.").

[4] Lucien Braan testified to this. No one has disputed that the calls occurred, and since that fact would have been readily verifiable, we accept it as a given.

mother outside.[5] Her hair, neck, chest, arms, and hands were covered in transmission fluid.[6] Appellant then appeared outside and called his mother a "black widow" and a "drug dealer."[7] Appellant retreated inside to an office when Officer Turner tried to talk to him.

Officer Braan arrived, and his car began recording video. On the video (at about the 1:16 mark), an officer could be heard saying, "Come on out of there." This command was repeated three more times, but Appellant did not comply. Officer Turner entered the office and discovered that transmission fluid was "all over" the office, including the floor.[8]

We next recount some of the statements made after this point, as heard on the Braan video, along with the approximate time stamps the statement occurred or the series of statements began. Five different times, an officer said, "Put it up." (1:40) That command later changed to, "Put it down," and was issued five times. (1:56) Appellant said, "I don't want to die." (1:59) Then, Appellant said, twice, "I got a lighter." (2:02) Afterwards he said, "You're going to blow us up." (2:16) Later, he said, "You're going to kill everybody." (3:08) Then an officer commanded, eight times, "Put the lighter down." (3:13) Appellant responded with, "You going to kill all of them," and, "You're going to die—everybody in this goddamn building." (3:39, 3:46) An officer asked, "Are you going to give up or not? " (3:55) Appellant responded, "You're going to die, motherfucker."

---

[5] Officer Turner was dressed in a full police uniform.

[6] Officer Turner and Appellant both testified that Appellant's mother was covered in transmission fluid. A photo confirms this.

[7] In questioning, the prosecutor represented that these statements were captured electronically, and Appellant conceded during his testimony that he made them. He also testified that his mother was not in fact a black widow or a drug dealer.

[8] Appellant testified that he arrived at the establishment five minutes before the police and that his mother and the business premises were covered in transmission fluid when he arrived.

(3:56). He followed up by saying, "We're all going to die." (4:05) At some point, Appellant's mother showed up at the doorway and said, "You're going to kill him." (5:42) Appellant responded, "They're beating me up, Mom." (5:45). Later, an officer ordered Appellant to, "Put your hands behind your back." (6:10) This order was issued four times, and Appellant said, "No," at least twice. About a minute later, an officer ordered Appellant to, "Put the screwdriver down." (7:10). Appellant would later deny on the recording that he used a screwdriver.

We now recount Appellant's version of the encounter, without trying to pinpoint where the various alleged events might fit the timeline of the video. Holding a taser and handcuffs, Officer Turner approached Appellant, but Appellant sat down and started smoking. Appellant had a feeling at this point "that they were going to take me to jail for – for whatever reason they could find."[9] Officer Turner ordered Appellant to put out the cigarette, come back out of the office, and talk to him, but Appellant refused. Officer Turner pulled on Appellant, attempting to drag him out. The

---

[9] The prosecutor later cross-examined Appellant on this topic:

Q. And then Officer Braan shows up and — and I think you said you were puffing on a cigarette because you had a feeling they were going to take you to jail.

A. Yes, sir.

Q. So just because you were you, they were taking you to jail. Is that what you're telling us?

A. I had been having bad luck with these cops here.

\* \* \*

Q. But you were under the belief that night that no matter what — you're not operating a car. You're inside of a family-owned business — you were going to jail; correct?

A. I felt that way.

two of them fell onto the floor, and Appellant was "tased" (hit with an electrical discharge from a taser).[10] At some point, during the struggle, Appellant was behind or underneath a desk, and both officers lifted the desk away from him.

After Appellant was tased, Officer Turner managed to cuff one of his hands, but Appellant continued to struggle against attempts to cuff the other hand:

> Q. And even if it [getting tasered] did have an effect, they were still unable to get you into handcuffs; right?
>
> A. Oh, they had a handcuff on me.
>
> Q. So they had successfully put one on, but you were resisting to allow them to put a second one on; correct?
>
> A. That's correct.
>
> Q. And when that first one went on, you didn't voluntarily say, here you go, put it on; right?
>
> A. No.
>
> Q. They were struggling and they were able to get -- or Officer Turner was able to get one on you; is that correct?
>
> A. Yes. When I was tasered the first time, they were able to put a handcuff on me.
>
> Q. And you said at this point you were tased multiple times -- at least more than one is what you said; correct?
>
> A. Yes, sir.
>
> Q. And they were still unable to gain compliance of you and put the second handcuff on; right?
>
> A. Yes, sir.

---

[10] Appellant claimed he "did not resist" and that "[w]e fell." He also claimed he was immediately tased upon hitting the floor.

Q. So you're resisting through this entire interaction; right?

A. Yes, sir.

Appellant testified that he began having difficulty breathing because Officer Turner was on top of him and pressing down against his chest and neck with his arm. Appellant claimed that he bit the officer in a desperate move to get him off. Appellant bit a large chunk of flesh out of the officer's arm.[11] When asked on cross-examination if he thought the officers were "trying to cut off [his] breathing," Appellant answered negatively, saying, "I don't believe that was their intention, no." When asked if "they were simply trying to detain you to figure out what was going on," Appellant responded, "I'm guessing that's what they are doing."

The prosecutor also asked:

> You understand you could have just stopped resisting and been put in cuffs. The handcuffs would have gone on and the officers would no longer have been on top of you. You understand that; right?

Appellant responded, "I didn't feel like that." And the prosecutor asked:

> And you continue to resist time after time after time when you had the ability to comply with officers, didn't you?

Appellant responded, "Yes."

## B. Trial and Appeal

Appellant was charged with multiple offenses, but the only one at issue here is assault on a public servant for biting Officer Turner. Appellant requested the submission of the defense of

---

[11] Photographs confirm the seriousness of the bite injury. Officer Turner testified, "It had to be washed out for weeks with antibacterial -- or it was basically a special soap, an antibiotic soap." Officers testified that Appellant kept biting him and that Officer Braun had to hit Appellant until he let go. Appellant, however, denied that, so police testimony about the length of time Officer Turner was bitten does not factor into our analysis.

necessity in the jury charge, and this request was denied.  However, the jury charge did include the defense of self-defense.  The jury convicted Appellant.

The court of appeals held that Appellant was not entitled to the necessity defense because it was undisputed that he provoked the difficulty.[12]  The court focused on the first element of the necessity defense that requires conduct to be "immediately necessary to avoid imminent harm."[13]  The court defined "necessary" as "required to be done" and concluded that "an actor's criminal conduct cannot be said to be required in any but the most attenuated sense of the word when it is his own prior actions that lead him to resort to criminality."[14]

In response to a claim of error in the self-defense instructions, the court of appeals held that any error was harmless because Appellant was not entitled to a self-defense instruction at all, because of the resisting-arrest limitation on self-defense.[15]  Under the resisting-arrest limitation, a person can use force against an officer only to protect against an officer's use of greater force than necessary to effectuate an arrest and only if that greater-force-than-necessary was used before the person offers any resistance.[16]  The court held that the only greater-force-than-necessary alleged by Appellant was the act of impeding his breathing, and, "By Navarro's own account, he offered resistance to Turner's efforts to handcuff him before Turner used this allegedly excessive force."[17]

---

[12] *Navarro v. State*, 649 S.W.3d 603, 615-18 (Tex. App.—Houston [1st Dist.] 2022).

[13] *Id.* at 616.

[14] *Id.*

[15] *Id.* at 621-22 & n.2.

[16] *See* TEX. PENAL CODE § 9.31(c)(1).

[17] *Navarro*, 649 S.W.3d at 621-22 & n.2.

### C. Discretionary Review

On discretionary review, Appellant challenges only the court of appeals's holding on the necessity defense. He argues that the court of appeals erred to apply a provoking-the-difficulty limitation on that defense. He further argues that, if a provoking-the-difficulty limitation could apply, it was a fact issue in this case for the jury to decide. Represented by the Comal County Criminal District Attorney's Office, the State argues that the court of appeals did not err in applying a provoking-the-difficulty limitation and that Appellant provoked the difficulty as a matter of law. The State Prosecuting Attorney (SPA), acting as *amicus curiae*,[18] echoes some of the State's arguments but also argues that we should overrule our prior decision in *Bowen v. State* and hold that the resisting-arrest exclusion in the self-defense statute also applies to the necessity statute.

### II. ANALYSIS

**A. If the resisting-arrest exclusion in the self-defense statute also operates as an exclusion under element (3) of the necessity statute, then Appellant was not entitled to a necessity defense.**

By statute, a defendant is entitled to the submission of a defense only if "evidence is admitted supporting the defense."[19] This standard means that the defense must be "raised by the evidence in the case."[20] And a defense is raised by the evidence only if the defendant establishes a "prima facie

---

[18] Having the primary authority to represent the State before this Court, the SPA has the power to step in and represent State in discretionary review proceedings. *Ex parte Taylor*, 36 S.W.3d 883, 885 (Tex. Crim. App. 2001). However, the SPA can choose to act as *amicus curiae*, as it has done here. *See Ex parte Lozoya*, 666 S.W.3d 618, 620 n.1 (Tex. Crim. App. 2023).

[19] TEX. PENAL CODE § 2.03(c).

[20] *Maciel v. State*, 631 S.W.3d 720, 722 (Tex. Crim. App. 2021).

case . . . as to each element of the defense."[21] Evidence establishing that prima facie case may be weak, impeached, or contradicted, and in determining whether the standard is met, we view the evidence "in the light most favorable to the defendant's requested jury instruction."[22]

The self-defense statute contains an exclusion for cases in which force is used to resist arrest:

(b) The use of force against another is not justified:

\* \* \*

(2) to resist an arrest or search that the actor knows is being made by a peace officer, or by a person acting in a peace officer's presence and at his direction, even though the arrest or search is unlawful, unless the resistance is justified under Subsection (c);

\* \* \*

(c) The use of force to resist an arrest or search is justified:

(1) if, *before the actor offers any resistance*, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search; and

(2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's (or other person's) use or attempted use of greater force than necessary.[23]

As explained earlier, the court of appeals found that, even viewing the evidence in favor of the defendant, Appellant fell within this resisting-arrest exclusion because he resisted before the officer engaged in the conduct that Appellant claims justified biting the officer. Appellant has not challenged this holding, and our review of the record leads us to conclude that the court of appeals was correct in this regard. Even under Appellant's own testimony, the officer tried to arrest

---

[21] *Shaw v. State*, 243 S.W.3d 647, 657-58 (Tex. Crim. App. 2007).

[22] *Maciel*, 631 S.W.3d at 723.

[23] TEX. PENAL CODE § 9.31(b)(2), (c) (emphasis added).

Appellant by placing him in handcuffs,[24] and Appellant continually resisted until the officer got on top of him and allegedly impeded Appellant's breathing. Thus, as the court of appeals held, Appellant was not in fact entitled to the self-defense instruction he received.

And it is of no consequence that Appellant's primary motivation at the time of the bite might have been to safeguard his life rather than to resist the officer. The resisting-arrest exclusion already presupposes that an officer might use "greater force than necessary" to effectuate an arrest and that a prospective arrestee is not permitted to resist such force if he had already previously resisted. A defendant in that situation could always claim that he was not trying to resist arrest but was just trying to protect himself against the unnecessary force. The Legislature has already foreclosed that sort of claim by prohibiting resistance to unnecessary force if the defendant had earlier resisted.

It is arguable that the resisting-arrest exclusion applies only when the harm sought to be avoided flows from force used by the arresting officer. The defensive portion of the self-defense statute refers to the subsection (b) exclusions while also talking about defending against another's use of force:

---

[24] *See White v. State*, 601 S.W.2d 364, 365-66 (Tex. Crim. App. 1980) (finding that officers sought to arrest for purposes of the resisting-arrest statute when, at the time the defendant resisted, the officers had him spread-eagled and held at gunpoint, and were preparing to handcuff him); *but see State v. Sheppard*, 271 S.W.3d 281, 283, 289-91 (Tex. Crim. App. 2008) (handcuffing does not automatically establish arrest for constitutional purposes); *nevertheless see Azeez v. State*, 248 S.W.3d 182, 191 & n.35 (Tex. Crim. App. 2008) (We have construed this provision [TEX. CODE CRIM. PROC. art. 15.22] to mean that, at least as a matter of state law, a restriction upon personal liberty that amounts to less than 'full custodial arrest' may nevertheless constitute an 'arrest.'") (citing *White* among other cases); *LeFever v. Dawson Cnty. Sheriff's Dep't*, 109 F.4th 1100, 1109 (8th Cir. 2024) (Officer's attempt, at roadside encounter, to place the suspect in handcuffs and use of taser discussed as part of appropriate conduct, given the suspect's resistance, in effectuating an arrest based on probable cause); *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1004 (6th Cir. 2024) (tasing mentioned as a reasonable measure to subdue an individual actively resisting arrest); *United States v. Nyah*, 35 F.4th 1100, 1106 (8th Cir. 2022) ("Anderson's tasing of Nyah constituted a warrantless arrest.").

> "Except as provided by subsection (b), a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force."[25]

Arguably the subsection (b) reference shows that the resisting-arrest exclusion (and the other subsection (b) exclusions) presuppose that the actor is seeking to protect against the use of force rather than some other harm.[26] Under that reasoning, for example, a defendant would not be covered by the resisting-arrest exclusion if the reason he resisted arrest was to rush a loved one to the hospital for emergency medical treatment, though he also would not be covered by the self-defense statute at all. But Appellant cannot claim that arguable method of avoiding the resisting-arrest exclusion because the sole harm he sought to avoid flowed from force used by the arresting officer. In summary, Appellant was not entitled to the self-defense instruction he received because he indisputably fell within the resisting-arrest exclusion.

The defense of necessity provides:

Conduct is justified if:

(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.[27]

---

[25] TEX. PENAL CODE § 9.31(a).

[26] *See In re Green*, 713 S.W.3d 843, 848-49, 854-55 (Tex. Crim. App. 2025) (addressing a prior court's conclusion that the word "civil" in one subsection carried over to a later subsection due to the earlier subsections's reference to the later subsection).

[27] TEX. PENAL CODE § 9.22.

The key to the SPA's argument is element (3). If the resisting-arrest exclusion to the self-defense statute constitutes a plainly appearing legislative purpose to exclude the justification claimed for the conduct that it covers, then Appellant would fail—as a matter of law—to meet element (3) of the necessity defense.

### B. *Bowen* held that we could not look at the self-defense statute to determine whether a defendant met element (3) of the necessity defense.

*Bowen* addressed the interplay of the exact provisions before us.[28] The question was whether the resisting-arrest exclusion in the self-defense statute constituted a legislative purpose to exclude the justification claimed so as to prevent the defendant from meeting element (3) of the necessity defense.[29] The Court in *Bowen* first asserted that the plain language of the necessity statute "indicates that the defense of necessity may be applicable in every case unless specifically excluded by the legislature."[30] The Court then said, "To determine whether a legislative purpose exists to exclude the [necessity] defense, we focus on the statute defining the charged offense."[31] The Court finally alleged that the availability of the necessity defense could not be viewed in light of the self-defense statute because "necessity and self-defense are separate defenses."[32] Thus, in determining whether element (3) of the necessity defense was met, *Bowen* specifically precluded the courts from looking at the self-defense statute—or any defensive provision other than the necessity statute itself.

---

[28] *See* 162 S.W.3d at 227-29.

[29] *See id.*

[30] *Id.* at 229.

[31] *Id.*

[32] *Id.*

**C. *Bowen* should be overruled.**

**1. Although this Court should not lightly overrule precedent construing a statute, such precedent can be overruled if the reasons for doing so are weighty enough.**

"The doctrine of *stare decisis* indicates a judicial preference for maintaining consistency with past decisions."[33] And "the interests of *stare decisis* are at their height for judicial constructions of legislative enactments upon which the parties rely for guidance in conforming to those enactments."[34] Reliance interests would seem to be the most heavily implicated when the judicial construction is of the scope of an offense or a defense. A construction of a statute that changes whether conduct is criminal could even implicate due process if applied retroactively, though such a retroactive construction will not always create a due-process violation.[35] And "part of the rationale for the strong tendency to adhere to a judicial construction of a statute is that, 'if the Legislature did not agree with the judicial interpretation, it would have acted to change the statute.'"[36]

But even in the area of statutory construction, "[p]recedent may be overruled if the reasons

---

[33] *Green*, 713 S.W.3d at 853.

[34] *Id.* at 854.

[35] *Rogers v. Tennessee*, 532 U.S. 451, 456, 459, 462-67 (2001) ("[L]imitations on *ex post facto* judicial decision making are inherent in the notion of due process" but the Court's prior opinion applying these limitations was couched "squarely in terms of that established due process right, and not in terms of the *ex post facto*-related dicta to which petitioner points. . . . Contrary to petitioner's suggestion, nowhere in the opinion did we go so far as to incorporate jot-for-jot the specific categories of *Calder* into due process limitations on the retroactive application of judicial decisions.") (holding that retroactive application of the abrogation of the "year and a day" doctrine in murder cases did not violate due process).

[36] *Green*, 713 S.W.3d at 854.

for doing so are weighty enough."[37] Factors that support the overruling of precedent include:

(1) that the original rule or decision was flawed from the outset,

(2) that the rule's application produces inconsistent results,

(3) that the rule conflicts with other precedent, especially when the other precedent is newer and more soundly reasoned,

(4) that the rule regularly produces results that are unjust, that are unanticipated by the principle underlying the rule, or that place unnecessary burdens on the system, and

(5) that the reasons that support the rule have been undercut with the passage of time.[38]

Another factor to consider is whether the precedent has proved "unworkable."[39]

**2. *Bowen* was flawed from the outset.**

**a. *Bowen* failed to conduct a proper statutory construction analysis.**

In determining whether a decision was "flawed from the outset," the issue is not whether we agree with it.[40] Rather, we look to whether the decision is "defensible."[41] A decision that is not defensible is flawed.[42] A statutory-construction decision is more likely to be defensible if it explicitly utilizes the correct statutory-construction framework, articulated by our seminal *Boykin*

---

[37] *Id.*

[38] *Id.*

[39] *Ex parte Sanders*, 663 S.W.3d 197, 204 (Tex. Crim. App. 2022).

[40] *See Green*, 713 S.W.3d at 854.

[41] *See id.*

[42] *Id.*

case.[43] And a decision utilizing that framework is likely to be defensible if the various analyses under that framework are "at least facially legitimate."[44]

*Bowen* made several references to the language of the necessity statute being "plain," but it did so solely on the basis of prior caselaw, none of which was on point.[45] Of course, any statutory-construction analysis must account for prior caselaw construing the statute.[46] But we must be careful to avoid over-relying on general legal maxims arising in prior cases because it can sometimes create the trap of interpreting a statute contrary to its language.[47] The touchstone of a statutory construction analysis should always be the text of the statute.[48] The *Bowen* decision failed to analyze the text of the necessity statute or how that text might interact with the language of the self-defense statute. And because (as we shall explain in more detail later) the cases relied upon by *Bowen* were not even close to being on point, the Court was not constrained by a previously-adopted construction of the applicable statutory language. *Bowen* was remiss in failing to conduct a *Boykin* statutory-

---

[43] *See id.* at 854-55 (citing *Boykin v. State*, 818 S.W.2d 782 (Tex. Crim. App. 1991) and discussing the use of the framework in *Lanford v. Fourteenth Court of Appeals*, 847 S.W.2d 581 (Tex. Crim. App. 1993)).

[44] *See id.* at 856.

[45] *See Bowen*, 162 S.W.3d at 228-29.

[46] *Williams v. State*, 273 S.W.3d 200, 215 (Tex. Crim. App. 2008) ("In conducting our inquiry, we keep in mind that we are not writing on a clean slate; we must take into account prior cases.").

[47] *See Milton v. State*, ___ S.W.3d ___, 2025 WL 1812862, *5 (Tex. Crim. App. 2025) (criticizing a prior court-of-appeals opinion for turning "common-sense judicial observations about crimes against children on their head by crafting a judicial rule that overrode the unambiguous language of some statutes to actually make them less protective of children").

[48] *See id.* at *6 (quoting from *Boykin*, 818 S.W.2d at 785 ("the Legislature is constitutionally entitled to expect that the Judiciary will faithfully follow the specific text that was adopted.")).

construction analysis.

### b. *Bowen*'s holding contradicts the plain language of the relevant statutes.

The SPA points out that one of the elements of the necessity statute is expressly limited to

the charged offense— element (2), which says:

> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented *by the law proscribing the conduct*.[49]

That limiting language is not, however, contained in element (3). The Legislature could have easily

included such language, to make element (3) look like this:

> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear *in the law proscribing the conduct*.

"[W]hen the legislature has carefully employed a term in one section of a statute and excluded it

within another, it should not be implied where excluded."[50] Here, element (2) contains a reference

to the "law proscribing the conduct," while element (3) does not. The only answer to this

---

[49] TEX. PENAL CODE § 9.22(2) (emphasis added).

[50] Ron Beal, *The Art of Statutory Construction: Texas Style*, 64 BAYLOR L. REV. 339, 367 (Spring 2012) (one of a list of statutory-construction canons that "cannot but help to be used by the court when reading a statute and discerning the plain meaning of the statute."); *see also Aguirre v. State*, 22 S.W.3d 463, 472-73 (Tex. Crim. App. 1999) (inclusion of a mental state in three alternative methods of committing an offense but not the fourth is "a clear implication of the legislature's intent to dispense with a mental element in that [fourth] section."); *In re City of Georgetown*, 53 S.W.3d 328, 343 (Tex. 2001) ("When the Legislature has used a term in one section of a statute and excluded it in another, the Court should not imply the term where it has been excluded."); *cf. Ex parte Kibler*, 664 S.W.3d 220, 230 (Tex. Crim. App. 2022) ("We have said that the rules of statutory construction require us 'to presume that the Legislature selected and used language in a careful and deliberate manner,' and 'the same rules should apply to the failure of the Legislature to include language.' We have also said that 'when the Legislature desires to convey a certain level of specificity within a statutory provision, it knows how to do it.' Had the legislature intended to foreclose reliance upon two prior convictions obtained in the same proceeding to determine when the duty to register as a sex offender expires, it could have crafted the statute to do so, as it did in both Section 12.42(d) and Section 12.425(a)(2) of the Penal Code.").

observation would be to construe the language in element (2) to carry over to element (3). But elements (2) and (3) appear to be independent requirements in separate subsections, and there is no language in one subsection explicitly referring to the other.[51]

In fact, an analysis of other textual characteristics of the necessity statute plainly shows that it was intended to interact with at least those defenses contained in Chapter 9 of the Penal Code, which includes the defense of self-defense. The necessity statute focuses on whether conduct is "justified." At its very beginning the statute says, "Conduct is *justified* if . . ."[52] This beginning phrase links to one of the introductory sections of Chapter 9, which states, "It is a defense to prosecution that the conduct in question is *justified* under this chapter."[53] Element (3) of the necessity defense also contains justification language: "a legislative purpose to exclude the *justification* claimed for the conduct does not otherwise plainly appear."[54] And every other defense in Chapter 9 contains justification language.[55]

---

[51] *Cf. supra* at n.26 (citing *Green*).

[52] TEX. PENAL CODE § 9.22 (emphasis added).

[53] *Id.* § 9.02 (emphasis added).

[54] *Id.* § 9.22(3) (emphasis added).

[55] *See e.g.*, *id.* §§ 9.03 ("Confinement is *justified* when force is *justified* by this chapter if . . ."), 9.04 ("The threat of force is *justified* when the use of force is *justified* by this chapter."), 9.21(a) ("[C]onduct is *justified* if the actor reasonably believes the conduct is required or authorized by law . . ."), 9.31(a) ("[A] person is *justified* in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."), 9.32(a) ("A person is *justified* in using deadly force against another [if] . . ."), 9.33 (A person is *justified* in using force or deadly force against another to protect a third person if . . ."), 9.41(a) ("A person in lawful possession of land or tangible, movable property is *justified* in using force against another when . . ."); 9.42 ("A person is justified in using deadly force against another to protect land or tangible, movable property [if] . . ."), 9.43 ("A person is *justified* in using force or deadly force against another to protect land or tangible, movable property

Importantly, the self-defense statute frames a number of exclusions in subsection (b) as "not justified": "The use of force against another is *not justified*" under various circumstances outlined.[56] Such a statement appears to explicitly denote—under necessity element (3)—a plainly appearing legislative purpose to exclude justification for those circumstances. In fact, short of explicitly saying, "The necessity defense does not apply," a statement that conduct is "not justified" is as clear a statement of "purpose to exclude [a] justification" as can be made. And if a statute did explicitly say, "The necessity defense does not apply if . . . ," we would not need element (3). The explicit exclusion of the necessity defense would speak for itself. One important rule of statutory construction is that we should avoid a construction that renders a particular provision meaningless.[57] To avoid rendering element (3) meaningless, we would need to construe it to reach a provision that is not quite that explicit but one that plainly speaks to the lack of justification for the conduct. A provision that says certain conduct is "not justified" is exactly that sort of provision.

And among the subsection (b) exclusions is the resisting-arrest exclusion, which continues the usage of "justified" terminology: "The use of force is *not justified* . . . to resist an arrest . . . that the actor knows is being made by a peace officer . . . , even though the arrest or search is unlawful, unless the resistance is *justified* under Subsection (c)."[58] In turn, subsection (c) provides that the "use of force to resist an arrest . . . is *justified* . . . if, before the actor offers any resistance, the peace officer . . . uses or attempts to use greater force than necessary to make the arrest" and only to the

---

of a third person if . . .") (brackets and emphasis added for each cited provision).

[56] *Id.* § 9.31(b) (emphasis added).

[57] *State v. Villa*, 707 S.W.3d 263, 267, 271 (Tex. Crim. App. 2024).

[58] *Id.* § 9.31(b)(2) (emphasis added).

degree reasonably necessary to protect against that type of force.[59] And no language in the resisting-arrest exclusion—or any of the subsection (b) exclusions—restricts its (or their) application to the self-defense statute or even to the subchapter under which that statute falls. Other provisions contain such restrictions.[60] By virtue of the plain language of both the necessity and self-defense statutes, then, the resisting-arrest exclusion constitutes a plainly appearing legislative purpose to exclude justification for the conduct that it covers that would preclude meeting element (3) of the necessity defense.

Other provisions in Chapter 9 contain exclusions for justifications proffered.[61] Although those provisions do not use the words "not justified," they nevertheless clearly outline circumstances in which a justification is disallowed.[62]

Thus, *Bowen* arrived at the wrong conclusion—and in fact, the exact opposite conclusion than it should have arrived at—when it held that the plain language of the necessity statute prevented looking at other defenses in general, and at self-defense in particular. At least when viewed in light

---

[59] *Id.* § 9.31(c) (emphasis added).

[60] *See id.* §§ 9.21(c) ("The use of deadly force is not justified under this section unless . . ."), 9.31(d) ("The use of deadly force is not justified under this subchapter except as provided in Sections 9.32, 9.33, and 9.34.").

[61] *See id.* §§ 9.34(a) ("A person is justified in using force, *but not deadly force*, against another when and to the degree he reasonably believes the force is immediately necessary to prevent the other from committing suicide or inflicting serious bodily injury to himself.") (emphasis added), 9.44(1) ("The justification afforded by Sections 9.41 and 9.43 applies to the use of a device to protect land or tangible, movable property if . . . the device is not designed to cause, or known by the actor to create a substantial risk of causing, death or serious bodily injury."). Penal Code § 9.54 (Limitation on Use of Force by Drone) also contains justification exclusions, *see id.* at § 9.54(b), but that statute did not exist at the time *Bowen* was decided.

[62] *See supra* at n.61.

of the other statutes contained in Chapter 9, element (3) of the necessity statute plainly embraces

Chapter 9 defenses, and its embrace of self-defense is especially obvious.

### c. If the necessity statute were ambiguous, extra-textual factors would foreclose *Bowen*'s construction.

But even if *Bowen*'s construction of the statute had been a viable one, so that there were two

arguable constructions—*Bowen*'s and ours—extratextual factors would slam the door against

*Bowen*'s conclusion that other defenses are irrelevant. The necessity defense was part of the 1974

Penal Code Revision Project.[63] When the State Bar submitted a "final draft" of a brand new

proposed Penal Code in 1970, the drafted necessity defense was identical to the defense as it exists

today.[64] In the commentary to the proposed Penal Code, the State Bar referred to another defense

in Chapter 9 to address the effect of necessity element (3):

> Moreover, Subdivision (3) makes the necessity defense unavailable if a legislative
> purpose to exclude it is expressed elsewhere in the law. Thus, homicide committed
> by a private citizen to effect an arrest is not justified because Section 9.51 so
> provides.[65]

In the State Bar draft, Section 9.51 provided that "[o]nly a peace officer is justified in threatening

or using deadly force against another . . . to make an arrest."[66] This exclusion in Section 9.51 was

---

[63]  *See* State Bar Committee on Revision of the Penal Code, TEXAS PENAL CODE: A PROPOSED REVISION, § 9.21, 82 (Final Draft, October 1970) ("State Bar draft").

[64]  *See id.* When the necessity defense was first enacted, the only variance from the State Bar draft was that the second element contained the word "prescribing" rather than "proscribing." *See* TEX. PENAL CODE § 9.22 (Vernon's 1974). This apparent transcription error was fixed by amendment, effective in 1994. *See* TEX. PENAL CODE § 9.22 (West 1996).

[65]  State Bar draft, § 9.21, Committee Comment., at 83.

[66]  *Id.*, § 9.51(c), at 99.

not enacted by the Legislature.[67]  So, after the 1974 Penal Code was enacted, the authors of the Practice Commentary selected another exclusion in Chapter 9—involving deadly devices under Section 9.44:

> Moreover, Subdivision (3) makes the necessity defense unavailable if a legislative purpose to exclude it is expressed elsewhere in the law.  Thus, use of a mantrap to protect property is not justified because Section 9.44 so provides.[68]

We have said that the "the practice commentary is often helpful because it was drafted by two individuals who were part of the Penal Code revision project."[69]  The Practice Commentary is less persuasive when the Legislature did not follow the State Bar draft.[70]  But for the necessity defense, the Legislature followed the State Bar draft exactly.  Here both the State Bar Committee and the Practice Commentary illustrated the effect of necessity element (3) by pointing to a defensive provision within Chapter 9.

### d. None of *Bowen*'s reasons for its holding withstand scrutiny.

The SPA contends that "*Bowen*'s rationales have never supported the weight put upon them."  We agree.  To begin with, when it said that "the defense of necessity may be applicable in every case unless specifically excluded by the legislature,"[71] *Bowen* significantly overstated what element (3)

---

[67]  *See* TEX. PENAL CODE § 9.51.

[68]  *See* Seth S. Searcy, III, and James R. Patterson*,* TEX. PENAL CODE § 9.22, *Practice Commentary*, 262 (Vernon's 1974) .

[69]  *Thompson v. State*, 236 S.W.3d 787, 798 (Tex. Crim. App. 2007); *see also Baumgart v. State*, 512 S.W.3d 335, 347 n.71 (Tex. Crim. App. 2017).

[70]  *Swenson v. State*, 707 S.W.3d 297, 304 n.53 (Tex. Crim. App. 2024); *Thompson*, *supra* at 798.

[71]  *See Bowen*, 162 S.W.3d at 229.

of the necessity defense actually requires. As we have explained earlier, an express statement that the defense of necessity does not apply to a particular offense would stand by itself, with no need for element (3) of the necessity defense. For element (3) to have any meaning, something less explicit would have to trigger a failure to meet that element. An accurate statement would have been to say that the necessity defense can apply to any offense so long as no statute plainly shows a legislative purpose to exclude it. *Bowen* pulled its "specifically excluded" statement from *Spakes v. State*,[72] but that statement was an overstatement when it was made in *Spakes*: the point the Court was making in *Spakes* was that it would not exclude the necessity defense on the basis of *non-statutory* factors.[73] In *Spakes*, the question was whether a person who needed to escape to avoid imminent injury must nevertheless turn himself in later to invoke the necessity defense.[74] No statute contained a surrender-yourself-later requirement.[75]

Secondly, in concluding that an inquiry under necessity element (3) must focus solely on the statute defining the charged offense,[76] *Bowen* read too much into our prior caselaw. *Bowen* relied upon the fact that *Vasquez v. State*[77] focused solely on the offense of possession of a firearm by a

---

[72] *See id.* at 229 n.13 (citing *Spakes v. State*, 913 S.W.2d 597 (Tex. Crim. App. 1996)).

[73] *See Spakes*, *supra* at 598 (rejecting application of factors developed in *People v. Lovercamp*, 43 Cal. App. 3d 823, 118 Cal. Rptr. 110 (1975), for use of necessity defense to the offense of escape).

[74] *Id.* at 597 ("The State's petition was granted to determine whether a predicate to the defense of necessity, as applicable to the offense of escape, includes an attempt to surrender once the immediate threat justifying the escape has ceased.").

[75] *See id.* at 598; TEX. PENAL CODE, *passim* (West 1992).

[76] *See Bowen*, 162 S.W.3d at 228-29.

[77] 830 S.W.2d 948 (Tex. Crim. App. 1992).

felon.[78] But no one ever suggested in *Vasquez* that there was a relevant defensive statute that might show a legislative purpose to exclude an alleged justification for the defendant's conduct.[79] Although defense counsel had apparently pursued self-defense in Vasquez's case, no one suggested that there was an exclusion in the self-defense statute relevant to possessing a firearm that would prevent invoking necessity,[80] nor are we aware of the existence of any such exclusion at the time of the offense.[81]

*Bowen* also relied upon *Johnson v. State*[82] focusing solely on the offense of unlawful carrying a firearm,[83] but, as in *Vasquez*, no one in *Johnson* pointed to an exclusion in some other defensive statute.[84] Nor are we aware of the existence of any such exclusion at the time the conduct was

---

[78] *Bowen*, 162 S.W.3d at 228 (discussing *Vasquez*).

[79] *See* 830 S.W.2d 948.

[80] *See id.* at 949.

[81] *See* TEX. PENAL CODE § 9.31, *passim* (Vernon's 1974) (version in effect until an amendment that became effective in 1994). The self-defense statute now contains an exclusion that involves illegally possessing a firearm, *see* TEX. PENAL CODE § 9.31(b)(5) (current) ("if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was . . . carrying a weapon in violation of Section 46.02"); *see also id.* (West 1995), but that exclusion did not exist when the conduct occurred, *see Vasquez v. State*, 796 S.W.2d 555, (Tex. App.—Houston [1st Dist.] 1990), *rev'd*, 830 S.W.2d 948 (events occurred on July 11, 1988), nor would it seem to have been implicated by the case facts. *See Vasquez*, 830 S.W.2d at 950 ("He stated that he escaped from his kidnappers when the man guarding him was distracted so that appellant was able to grab a gun and escape.").

[82] 650 S.W.2d 414 (Tex. Crim. App. 1983), *overruled in part on other grounds by Boget v. State*, 74 S.W.3d 23, 31 (Tex. Crim. App. 2002).

[83] *See Bowen*, 162 S.W.3d at 228 (discussing *Johnson*).

[84] *See Johnson*, 650 S.W.2d at 415-17. To the extent *Johnson* discussed defensive statutes in Chapter 9, it was to use those statutes as affirmative support for a necessity defense, *see id.* at 416, which, if anything, would suggest a relationship between necessity and those other defensive provisions. But the overruling of part of *Johnson* makes reliance on that discussion problematic.

committed in *Johnson*.[85]  In fact, the ostensible reason for *Johnson*'s focus on the offense was the

fact that it overruled a prior case that had said that the *firearm offense* evinced a legislative purpose

to exclude the necessity defense.[86]  *Johnson* was correct that the prior case was wrong, but that

holding says nothing about whether we can look at a defensive statute under necessity element (3).

And *Bowen* relied upon *Spakes* focusing only on the offense of escape to determine the

applicability of necessity.[87]  But no one in *Spakes* ever suggested that there was a provision in a

defensive statute that could have eliminated the availability of the necessity defense to the offense

of escape.[88]  Rather, the State and the dissent relied upon a non-textual consideration (whether or not

the defendant turned himself in later),[89] and the dissent conceded that element (3) of the necessity

defense was not at issue and focused on the balancing of interests in element (2).[90]  *Spakes* was about

focusing on statutory text, not about whether we should focus on "offense" text or "defense" text.

And it is telling that we are not aware of *any* offense that contains language that would

---

*See infra* at. nn.104-08 and associated text.

[85]  The self-defense statute at the time of the conduct in *Johnson* would have been the same one applicable to *Vasquez*.  *See supra* at n.81.

[86]  650 S.W.2d at 415-16 (overruling  *Roy v. State*, 552 S.W.2d 827 (Tex. Crim. App. 1977)).

[87]  *See Bowen*, 162 S.W.3d at 228-29 (discussing *Spakes*).

[88]  *See Spakes*, 913 S.W.2d at 597-98.

[89]  *See id.* at 597 (remarking that the State was relying upon *Lovercamp*); *id.* at 599-602 (Keller, J., dissenting) (addressing public policy considerations).

[90]  *Id.* at 599 (Keller, J., dissenting) ("While the majority opinion clearly addresses the first and third elements, I believe that it has failed to properly take into account the second element.  The second element requires an assessment of the policy reasons for taking a particular action and balances the interests of society versus those of the individual.").

exclude the application of the necessity defense under necessity element (3).[91] This Court held in *Roy* that a firearm statute codified such an offense, but *Roy* was overruled before *Bowen* was decided.[92] Perhaps there is such an offense, and we have simply not had an occasion to consider it. But it seems very likely that the category *Bowen* created—of offenses that exclude the application of the necessity defense under necessity element (3)—is an empty set. And that seems especially likely to be the case for Penal Code offenses. Yet, as we have discussed earlier, the Penal Code contains obvious necessity-excluding language in the *defensive* provisions within Chapter 9.

Finally, *Bowen*'s statement that "necessity and self-defense are separate defenses,"[93] while a truism in one sense, is unsupported (and perhaps insupportable) if construed broadly. The defenses are separate in the sense that they are codified in separate sections of the Penal Code and have their own elements. That truism says nothing about whether an exclusion in the self-defense statute could affect the application of the necessity statute. The whole point of necessity element (3) is that another statute could contain language that plainly excludes the necessity justification being claimed in a particular case, and nothing in the language of that element limits such an exclusion to statutes defining offenses.

Moreover, in addition to necessity element (3), there is textual support for the notion that, although it is a separate "defensive issue," necessity is not an entirely separate "defense" from other defenses contained in Chapter 9: Section 9.02 says, "It is a defense to prosecution that the conduct

---

[91] The SPA makes this point in its brief, at least with respect to the Penal Code, saying, "[T]here appears to be no 'purpose to exclude' that satisfies *Bowen* in any Penal Code offense."

[92] *See supra* at n.86.

[93] *See Bowen*, 162 S.W.3d at 229.

in question is justified under this chapter."[94]  Under this language, the "defense" is that "conduct . . . is justified . . . under this chapter."  This language contrasts with other defenses in the Penal Code that are individually denominated "defenses."[95]  Section 9.02 and the justification language throughout Chapter 9 suggests a closer relationship between the various justifications within that chapter than would ordinarily be true of defenses.  In fact, several other sections within Chapter 9 refer to other sections within that chapter.[96]

And the cases *Bowen* cited in support of its conclusion that necessity and self-defense are separate defenses do not expressly say that, nor do they support the broad construction of separateness that *Bowen* implied.  *Bowen* relied upon *Boget v. State*,[97] which said that a trial court must, when properly requested, "charge on every defensive issue raised by the evidence."[98]  That truism does not say anything about whether two defenses might interact.  If the self-defense statute contains an exclusion that also constitutes a plainly appearing legislative purpose under necessity element (3), then that could cause neither defensive justification to be raised by the evidence in a particular case.

---

[94]  TEX. PENAL CODE § 9.02.

[95]  *See e.g.*, *id.* §§ 8.02(a), 8.06(a), 13.041(b), 22.04(k), 22.041(g), 22.06(a), 42.04(c).

[96]  *See id.* §§ 9.21(b) (referring to other subchapters within Chapter 9), 9.31(d) (referring to §§ 9.32, 9.33, 9.34), 9.32(a)(1) (referring to § 9.31), 9.33(1) (referring to §§ 9.31, 9.32), 9.42(1) (referring to § 9.41), 9.43 (referring to §§ 9.41, 9.42), 9.44 (referring to §§ 9.41, 9.43), 9.54(b)(2)(A) (referring to "another provision of this subchapter").  Of course, we caution courts not to take this observation too far and to look at the language of the particular statute in question to determine how a particular justification defensive issue operates.  *See supra* at n.47.

[97]  *Bowen*, 162 S.W.3d at 229 & n.15 (citing *Boget*, 74 S.W.3d at 31).

[98]  *Boget*, *supra*.

Also, the State in *Boget* claimed that the defendant did not need a self-defense instruction because a necessity instruction would sufficiently protect his interests.[99]   To the extent *Boget* addresses a situation factually *inverse* from this case—getting a necessity instruction and not getting a self-defense instruction—it cannot speak to the question before *Bowen* or us because the self-defense statute does not have an element like element (3) in the necessity statute.  One can say that the resisting-arrest exclusion in the self-defense statute prevents the application of the necessity statute by virtue of necessity element (3), but one cannot invert the facts and find self-defense to be barred because of the necessity statute.  Moreover, the State was wrong in *Boget* to suggest that a trial court could determine whether a particular defensive issue serves the defendant's "interests."  If a defendant requests a defensive issue, then it should be submitted if it is raised by the evidence, even if another defensive issue might seem to give effect to the defensive evidence just as well or even better.[100]  That  does not exclude the possibility that two defensive provisions could interact in a particular case.

*Bowen* also relied on *Johnson* to support its "separateness" argument,[101] but, *Johnson* did not even come close to articulating the holding *Bowen* cites it to support.[102]  And *Johnson* was overruled in part,[103] and the part that is no longer good law impacted what little the Court had to say about the interaction between necessity and other defenses.  *Johnson* held that self-defense could not apply to

---

[99]  *Id.*

[100]  However, such a conclusion might be relevant to a harm analysis.

[101]  *Bowen*, 162 S.W.3d at 229 & n.15.

[102]  *See Johnson*, 650 S.W.2d at 415-16.

[103]  *See supra* at n.82.

the carrying-a-firearm offense because none of the elements of that offense involved the use of force.[104] That reasoning would have applied equally to other use-of-force defenses, such as those that protect other people and property.[105] That would leave necessity as the only available defense to assert a use-of-force justification for carrying a firearm, and in fact, *Johnson* pointed to various use-of-force defenses to explain how the availability of a necessity defense could "easily be imagined."[106] For example, under *Johnson*, if a defendant had to carry a gun to a neighbor's house to protect the neighbor from a home invader, he could not use the "defense of others" justification in § 9.33 in a prosecution for illegally carrying a firearm, but he could use the necessity defense to satisfy the interests that § 9.33 was designed to protect.[107] Because *Boget* overruled *Johnson*'s "use of force" holding,[108] it is unclear what, if anything, can now be derived from any comments *Johnson*

---

[104] *See Johnson*, 650 S.W.2d at 416.

[105] *Compare* TEX. PENAL CODE § 9.31 *with id.* §§ 9.33, 9.42, 9.43 (quoted in *supra* at n.55).

[106] *Johnson*, 650 S.W.2d at 416.

[107] *See id.* ("An example of when the defense of necessity should be available can easily be imagined. V.T.C.A., Penal Code Secs. 9.33, 9.42 and 9.43 justify the use of deadly force for the protection of property or a third person. If an individual in his own home observed a situation that required taking protective action under one of those sections, but to take such action would require him to take a weapon covered by Sec. 46.02 to another location, such as his neighbor's yard, would his conduct in carrying a handgun or club to protect his neighbor from rape or robbery (Sec. 9.33), or to recover his neighbor's property (Sec. 9.43), or to recover his own property from a criminal who has fled beyond the victim's premises (Sec. 9.42), be subject to conviction for unlawfully carrying the weapon? Surely the legislature intended the defense of necessity under Sec. 9.22 to be available in such circumstances. . . . Holding self-defense is not available, however, does not have the dire consequences envisioned by the Court of Appeals. The defense of necessity is sufficient to protect the interest of the accused that was the object of concern by the Court of Appeals.").

[108] *See Boget*, 74 S.W.3d at 31 ("[W]e overrule that portion of *Johnson* which holds self-defense is a justification only where the defendant is charged with an offense involving the use of force against another.").

made about the influence of other defenses on the necessity defense.

To further buttress its conclusion that "separate defenses" were "independen[t],"*Bowen* pointed to cases holding that a defendant was entitled to the submission of every defensive issue raised by the evidence even when they were inconsistent with each other.[109] But the SPA is correct that allowing contradictory defenses is based on the jury's prerogative as the factfinder to accept or reject evidence as it sees fit,[110] not on whether defenses can or would likely interact. And the cases *Bowen* cited in support of its "inconsistent defenses" proposition, *Hamel* and *Thomas*,[111] do not even speak to the submission of inconsistent defensive issues. *Hamel* held that a defendant was entitled to a self-defense instruction if he reasonably believed he needed to protect himself from a person who was imminently about to use deadly force.[112] *Thomas* held that a necessity defense could be submitted so long as it was supported by evidence, even if other defensive evidence supported a conclusion that the defendant did not commit one of the elements of the offense.[113] *Thomas* did say that the defendant could rely upon "more than one defensive theory," but only one of the defensive theories at issue in *Thomas* was an actual defensive issue; the other was a mere denial of the

---

[109]  162 S.W.3d at 229 & n.16.

[110]  *Booth v. State*, 679 S.W.2d 498, 501-02 (Tex. Crim. App. 1984) ("[I]t is permissible for the accused to have the jury decide inconsistent defensive theories, even when they might directly contradict one another. . . . [T]he jury, as the trier of the facts, was entitled to determine the credibility of that evidence. It was the responsibility of the jury to accept or reject the various versions appellant gave as to how the killings took place, or it was free to accept the State's version that was presented through the inculpatory portion of appellant's written statement.").

[111]  *See Bowen*, 162 S.W.3d at 229 n.16 (citing *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App.1996); *Thomas v. State*, 678 S.W.2d 82, 84 (Tex. Crim. App. 1984)).

[112]  *Hamel*, *supra* at 493-94.

[113]  *Thomas*, 678 S.W.2d at 84-85.

elements of the offense.[114]  In any event, neither *Hamel* nor *Thomas* come even close to standing for a preference not to construe defensive statutes to interact with each other.

To the extent *Bowen* articulated "common-sense judicial observations," the decision misused them.[115]  None of the cases relied upon by *Bowen* lend any support to construing the necessity statute as it did.

In summary, *Bowen* failed to employ a proper statutory construction analysis, construed the necessity statute contrary to its plain language *and* the drafters' commentary, and relied upon cases and legal concepts that did not support its holding.  We easily conclude that the *Bowen* decision was flawed from the outset.

### 3.  *Bowen* creates unjust results by making police officers less safe and by causing widespread damage to the statutory scheme.

The obvious purpose of the resisting-arrest exclusion in the self-defense statute is to safeguard the life and health of our law-enforcement officers.  The exclusion accomplishes this by generally denying a justification for resisting arrest, even when an arrest is illegal.[116]  The exclusion also accomplishes this by creating a limited right to resistance if the officer uses more force than necessary to accomplish an arrest but denying this limited right to resistance if the person being arrested resisted first.[117]

This ban on resisting first is an anti-escalation provision.  Once a prospective arrestee resists,

---

[114]  *Id.* at 85.

[115]  *See Milton*, 2025 WL 1812862, at *5.

[116]  *See* TEX. PENAL CODE § 9.31(b)(2).

[117]  *See id.* § 9.31(c)(1).

he cannot justify escalating his violence on the ground that the officer overreacted to his resistance. The statute thus places the risk of an escalation on the arrestee rather than on the law-enforcement officer. *Bowen* undermines this protective scheme by creating a loophole that could allow an arrestee to escalate his violence. And the existence of that loophole has the potential to play a role every time a suspect resists arrest—an officer will almost always have to escalate the use of force if a prospective arrestee resists, and an actively resisting person creates a stressful situation that could impair the ability of an officer to precisely calibrate the level of force to be used. By turning a bright-line rule against escalating resistance into a muddied one, the *Bowen* loophole complicates the decision-making of an arresting officer and affords an arrestee the hope that an escalation of resistance might turn out to be permitted—seriously undermining the deterrent value of the resisting-arrest exclusion.

But the damage created by *Bowen*'s holding is not confined to the resisting-arrest exclusion. The self-defense statute contains four other exclusions that would apply to the necessity defense under necessity element (3) but for *Bowen*: (1) for verbal provocation alone, (2) for consent, (3) when the actor provokes the other's use of force, and (4) when the actor seeks an explanation of differences while illegally possessing or carrying a weapon.[118] In addition, exclusions exist for the use of deadly force to prevent self-harm[119] and for the use of a deadly device to protect property (the "mantrap" example given in the Practice Commentary).[120] Also, there are limitations on

---

[118] *See id.* § 9.31(b)(1), (3) - (5).

[119] *Seee id.* § 9.34(a)

[120] *See id.* § 9.44(1). Exclusions also exist for the use of force by a drone if the drone is a deadly automaton or the person operating the drone is not law enforcement, *see id.* § 9.54(b)(1), (2)(A), though these exclusions were enacted after *Bowen*.

justifications to arrest or search that might operate effectively as exclusions.[121] The existence of other statutory provisions affected by *Bowen*'s flawed and wrong decision provides additional reason to overrule it.

### D. Response to Dissent

The dissent contends that we should not address whether *Bowen* should be overruled because (1) the court of appeals did not address the issue, (2) the issue was raised only by an amicus, and (3) we have not granted review of the issue. None of these contentions has merit.

Let's start with the argument that the court of appeals did not address the issue. A court of appeals cannot overrule a decision of this Court.[122] The court of appeals *could not* address the issue because only this Court can. And to the extent the dissent implies that the court of appeals's decision was not affected by *Bowen*, it is clearly mistaken. As we explained in parts I.B. and II.A., the court of appeals found that Appellant was not in fact entitled to the self-defense instruction that he received because he fell within the resisting-arrest exclusion as a matter of law. It is that very same resisting-arrest exclusion that we now hold, after overruling *Bowen*, precludes a necessity defense. Without *Bowen*, the court of appeals's holding on the self-defense issue would have inexorably disposed of the necessity issue as well. It is because of *Bowen* that the court of appeals had to invoke the doctrine of provoking the difficulty as a workaround to hold that Appellant was still not entitled to a necessity instruction. Nor is it persuasive to argue that we should just wait for a case in which the court of appeals finds in the defendant's favor to decide whether *Bowen* should be overruled.

---

[121] *See id.* § 9.51.

[122] *State v. Krizan-Wilson*, 354 S.W.3d 808, 817 (Tex. Crim. App. 2011) ("However, the court of appeals is bound by the precedents of this Court."); *see also State v. Newton*, No. PD-0363-24 & PD-0364-24, --- S.W.3d ---, 2025 WL 2150290 (Tex. Crim. App. July 25, 2025).

Appellant is seeking on discretionary review to overturn the court of appeals's holding against him.

The dissent argues that we cannot address whether *Bowen* should be overruled because the issue was advanced only in an amicus brief. Of course, the whole point of allowing an amicus brief is that it might influence the Court. And even if it is true that courts generally will not consider an issue raised only by amicus, that is clearly not an absolute rule. The United States Supreme Court has explicitly said that "we will consider arguments raised only in an amicus brief" and cited *Teague v. Lane* as an example.[123] In *Teague*, the Supreme Court considered whether the constitutional fair-cross-section requirement applied retroactively, even though the issue was raised only by an amicus.[124] The court observed that the issue was not "foreign" to the parties because they were addressing the issue of whether *Batson*[125] claims were retroactive and that *sua sponte* consideration of a retroactivity issue was far from novel.[126]

---

[123] *Davis v. United States*, 512 U.S. 452, 457 n.* (1994) (citing *Teague v. Lane*, 489 U.S. 288, 300 (1989) (plurality op.)); *see also D.K. v. United Behav. Health*, 67 F.4th 1224, 1237 n.7 (10th Cir. 2023) ("We may consider arguments raised only in amicus briefs, but only in exceptional circumstances, such as 'jurisdictional questions or . . . issue[s] of federalism or comity that could be considered sua sponte.' The amicus brief discusses the appropriate role for courts in reviewing regulations, a topic we may consider sua sponte, and the motion is thus GRANTED.") (citation omitted); *Adkisson v. Jacobs Eng'g Grp.*, 35 F.4th 421, 432 (6th Cir. 2022) ("This court has not definitively held that we can consider an argument raised solely in an amicus brief. See *Bormuth v. County of Jackson*, 870 F.3d 494, 530 n.1 (6th Cir. 2017) (Moore, J., dissenting) ('[T]he Supreme Court has held that it can consider arguments raised only by amicus. If the Supreme Court considers arguments raised only by amicus, there is no reason this court should not do so as well.' (citing *Davis*). Other circuits have held that courts of appeals 'clear[ly]' have 'the discretion to reach arguments raised only in an amicus curiae brief.' But these circuits have held that '[i]t is equally clear, however, that we should exercise that discretion only in exceptional circumstances.'") (some citations omitted).

[124] *Teague*, 489 U.S. at 300.

[125] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[126] *Teague*, 489 U.S. at 300.

We find that analogous considerations are present here: First, Appellant has used *Bowen* as a "sword" to advance his claims, so it is not entirely unexpected that he might be called upon to defend that case. In his PDR, Appellant relied expressly on *Bowen* for the proposition that "the legislature did not limit the necessity defense in the Penal Code,"[127] and he expounded on it in depth to support the claim that "this Court has never limited the necessity defense."[128] Appellant carried forward those claims and his reliance on *Bowen* in his briefing.[129] And Second, we have in the past overruled a prior decision on our own initiative when we thought at least one of the parties' arguments implicated the issue even though neither of the parties addressed whether the decision should be overruled.[130]

Moreover, as we have noted earlier, the SPA is no ordinary amicus; it actually has primary authority to represent the State in this Court.[131] The dissent does not suggest that any of the other amici in the cases it cites occupied that sort of unique position. An Appellant who ignores an amicus

---

[127] *See* Appellant's PDR at 12 (some capitalization converted to lowercase for ease of reading).

[128] *See id.* at 13-14 (some capitalization converted to lowercase for ease of reading).

[129] *See* Appellant's brief on discretionary review at 17-19.

[130] *See Fienen v. State*, 390 S.W.3d 328, 332, 334-35 (Tex. Crim. App. 2012) ("Appellant argues that the breath specimen he provided was not voluntary and that *Erdman* controls . . ." and the State argued that the police officer's statements were not a "warning" and that *Erdman* was distinguishable. This Court overruled *Erdman*.); *Malik v. State*, 953 S.W.2d 234, 236, 239 (Tex. Crim. App. 1997) ("But the State's contention that *Jackson*, by its wording, applies only to elements of the offense is a cogent one. When, as in the present case, our precedents appear to require us to stray far afield from the holding that originated a constitutional doctrine, we should reexamine those precedents to determine their continuing validity." The Court overruled the *Benson/Boozer* line of cases.); *id.* at 242 (Meyers, J., concurring) ("The State does not cite to *Benson* and *Boozer*, much less present an argument for overruling those opinions.").

[131] *See supra* at n.18.

brief from the SPA does so at his peril. And while the SPA briefed the issue in the alternative, it nevertheless briefed the issue. Appellant had notice of it and could have submitted a response to it.

Nor do we find persuasive the dissent's argument that we must grant review of *Bowen*'s continued viability for it to be an issue in the case. This Court has in fact occasionally overruled a prior decision to defeat a petitioning appellant's claim on discretionary review, without granting a separate ground for review.[132]

### III. DISPOSITION

We overrule *Bowen* and conclude that Appellant was not entitled to the submission of a necessity defense. We affirm the judgment of the court of appeals.

Delivered: November 6, 2025

Publish

---

[132] *See Easley v. State*, 424 S.W.3d 535, 536 (Tex. Crim. App. 2014) (affirming the court of appeals while overruling "previous cases holding that preventing a defendant's counsel from asking proper questions of the venire is an error of constitutional dimension per se."); *Fienen*, 390 S.W.3d at 332-35 (affirming the court of appeals while overruling the holding of *Erdman v. State*, 861 S.W.2d 890 (Tex. Crim. App. 1993)); *Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003) (affirming the court of appeals while overruling cases that held contrary to the proposition that "a 'due administration of justice' means a judge should reopen the case if the evidence would materially change the case in the proponent's favor"); *Jordan v. State*, 54 S.W.3d 783, 785-86 (Tex. Crim. App. 2001) (affirming court of appeals while overruling cases recognizing the "habeas corpus" exception to the bar against challenging a guilty plea on revocation of probation); *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997) (affirming court of appeals while overruling cases that conflicted with the holding that a harm analysis applies except for certain structural errors).